**Carl M. LOEB, Rhoades & Co., and The Home Insurance Company, Libelants,**

v.

**THE S.S. WASHINGTON MAIL, her engines, etc., and American Mail Line, Ltd., Respondents.**

United States District Court
S. D. New York.

Dec. 19, 1956.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for libelants, Arthur O. Louis, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for respondents. Tallman Bissell and Francis V. Elias, New York City, of counsel.

KNOX, District Judge.

In this suit, libelants seek recovery of the sum of $4,607.50, the agreed value of 38 bales of rubber which, out of a shipment of 224 bales, were undelivered after the steamship, Washington Mail, discharged her cargo; part at Los Angeles, and the remainder at San Diego, California, in September and October, 1951.

According to the bills of lading, libelants' shipment was to be carried from Penang to San Francisco, but, due to dock conditions prevailing at the latter

---

3. Scott v. McGill, 245 Ala. 256, 16 So. 2d 866.

4. Walker v. Walker, 256 Ala. 195, 54 So. 2d 281.

port, the ship proceeded to Los Angeles, and then to San Diego. She reached Los Angeles on September 28, 1951, and discharged about one half of her cargo. The last delivery from the docks at that point was upon October 18, 1951. The steamer reached San Diego on October 1, 1951, completed her discharge on October 8, and sailed. The last delivery of cargo at this port was on October 31, 1951. On the 11th day of that month, libelants' cargo interests received 186 bales of their original consignment. The balance of 38 bales was never delivered.

Libelants take no exception to the fact that the ship did not discharge her goods at San Francisco.

On the voyage in question, the Washington Mail's manifest indicates that she carried 70,692 bales of rubber for delivery to numerous consignees.

The parties have stipulated that:

"* * * (6) Manuel Garcia, if called as a witness, would testify that he was employed as a checker at San Diego, California, by the San Diego and Arizona Railroad; that the initials 'M. G.' at the lower left corner of the * * * document entitled, 'Railroad Loading Ticket', marked Exhibit 2, are his initials; that the said document was prepared by him and others, and was initialed by him in the performance of his regular duties; that he does not have a present recollection of the matter independent of the said document; and that the date when the words, 'checked short 38 bales', and who inserted them is now unknown."

The parties also agree that "Beck, whose name appears on the said document as the steamship checker, is deceased."

On January 30, 1952, the American Mail Line, Inc., one of the respondents herein, attempted to trace the undelivered bales on which the libel is founded, together with certain other "missing" bales. But, so far as the 38 bales are concerned, the tracer was of no avail.

The original libel herein was filed by Carl M. Loeb, Rhoades & Co. on October 14, 1952. The following day, an amended libel, which sets forth Home Insurance Company, as subrogee of Carl M. Loeb, Rhoades & Co., was filed.

The bill of lading covering the shipment in question provides, in Clause 1 thereof, as follows:

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936 [46 U.S.C.A. § 1300 et seq.], which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the Carrier. The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or misdelivery, or loss or damage to the goods occurring while the goods are not in the actual custody of the Carrier."

Respondents concede that, if the loss occurred after discharge, the bill of lading provisions are applicable; if it occurred on board, the Act itself governs, so that, in either event, there is a one-year limitation. The pertinent portion of the Act reads as follows:

"(6) * * *

"In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered." Title 46 U.S.C.A. § 1303(6).

On June 4, 1954, respondent, American Mail Line, Ltd., answered the libels. Its sole defense at the time of trial was that this suit was not filed within the

one-year time limitation contained in the said statute, and/or other provisions of the bill of lading.

In the testimony, taken by deposition, of Thompson, a former employee of Williams, Dimond Company, which handled the ship in her discharge at San Diego, he said that in October, 1951, shipments of rubber entering this country were subject to examination as to grade and weight, and were inspected by firms designated by the General Services Administration, an agency of the United States.

After such firms had made their inspections, reports were submitted, and on the basis of such reports, General Services Administration forwarded so-called "release" forms to the carrier's agents. The releases contained directions as to where the various rubber shipments should be dispatched, and as to how they should be loaded into railway cars. Delivery could not be effected until releases were received by the ship's agents.

A release covering 186 bales of consignee's rubber was received by respondents on October 9, 1951. Therefore, on that date, respondents say, delivery was demanded on behalf of the consignee.

Thompson also stated that each lot of rubber, as it was discharged from the vessel, was segregated, and placed by itself. When a release, covering a particular portion of the cargo, was received from the governmental agency, he prepared a car tag, and it was given to a checker. As a railroad car was loaded, the checker recorded his tally on the loading tag, and it was his duty to note thereon any shortage that then existed. This was done. Such document shows, that it was prepared on October 11, 1951, and on that day, said 186 bales of rubber were placed in a car, destined to Shawnee, Oklahoma.

Libelants call attention to that portion of Thompson's testimony wherein he stated that the loading of rubber into railway cars continued "for quite a while beyond October 11," and "that such date was the third day on which railroad cars were loaded." Through that day, a total of 6,414 bales were placed in cars. Approximately 30,000 bales were delivered subsequent to October 11th.

Thompson further said that, as of that date, "there was no way in which anyone could know that there was (an actual) shortage of these 38 bales until all the rubber on the San Diego pier had been loaded."

Respondents contend that the latest day on which the limitation statute began to run was October 11th.

Respondents also say that, although the words, "should have been delivered," as contained in the contract of carriage, as respects a partial delivery, have not been judicially interpreted, this Court should follow decisions which have interpreted similar language in the following cases: The West Arrow, D.C., 10 F.Supp. 385; Aristo Hosiery Co. v. Atlantic Coast Line Railroad Co., 129 Misc. 305, 221 N.Y.S. 298, and Henley & Co. v. N. V. Nederlandsche-Amerikaansche, etc., 1956, A.M.C. 350. None of them, in my opinion, should control this litigation.

Libelants take the position that, upon October 11, 1951, when 186 bales of their consignment were placed in a railway car, and 38 bales were still to be delivered, the date upon which the latter "should have been delivered" ran either to the date on which respondents' tracer failed to locate the 38 missing bales, i. e., March, 1952, or to the date when the last delivery of other cargo was made from the dock at San Diego, viz., October 31, 1951. In support of this position, the following cases are cited: Ungar v. The Urola, 1946, A.M.C. 1663; E. Gerli & Co., Inc., v. Cunard S.S. Co., 2 Cir., 48 F.2d 115; Hellyer v. Nippon Yesen Kaisya, D.C., 130 F.Supp. 209, and Potter v. North German Lloyd, D.C., 50 F. Supp. 173. Here, also, I shall undertake no analysis of the decisions made therein. This suit is *sui generis*.

Libelants urge that there was no pattern of complete delivery at one time of the quantities of rubber which moved under each bill of lading. Two deliveries, I am told, were of a piecemeal

character, viz., 2,500 bales, marked "Lee, 564," were delivered between October 17 and October 31, 1951; and 1,500 bales, marked "G 3728," were delivered between the dates of October 26 and October 30, 1951.

These facts, I think, are of slight, if any, importance. The reasons contributing to the prolongations of time in making the deliveries just mentioned have not been shown. They may have been due to the bulk of the shipments, the unavailability of rail cars, or other factors. However, they seem to have been of a continuous character, and also, were complete, not partial, as in this case.

When libelants received 186 bales of their goods on October 11th, they had a right to believe that the vessel, by its admission in the bill of lading, had taken on board the entire shipment that was made at Penang. See: American Trading Co., Inc., v. The Harry Culbreath, 2 Cir., 187 F.2d 310, and Karabagui v. Shickshinny, D.C., 123 F.Supp. 99, 102. There was no reason to think otherwise. Consequently, on receiving a partial delivery of their goods, libelants naturally could, and would, assume that the missing bales had been discharged from the vessel, and that due to the hustle and bustle, and, perhaps, confusion, that prevailed upon the pier, had merely been mislaid; and, further, that in the course of handling the mass of some 30,000 bundles of like cargo, the missing bales would be located and delivered.

Libelants wanted the balance of its property and respondents, doubtless, wished to fulfill the contract of carriage. Had they done so upon October 31st, when other consignees were receiving their cargo in ordinary course, libelants would have received the 38 bales within a reasonable time after the vessel's discharge of her cargo.

The mischance that prevented libelant consignee from receiving its entire shipment is attributable to the ship, and/or its owners, and libelants should not be prejudiced thereby. It, perhaps, should be noted that, since respondents did not locate the 38 bales, General Services Ad-ministration could not issue a release therefor.

I think the time limitation contained in the bill of lading in this suit did not begin to run prior to October 31, 1951, and that libelants should have a decree. It will be so ordered.